492 S.E.2d 62

Paul ROSS, M.D., Appellant,

v.

MEDICAL UNIVERSITY OF SOUTH CAROLINA, James B. Edwards, W. Marcus Newberry, Stanley C. Baker, Jr., Thomas C. Roland, M.D., Melvyn Berlinsky, Wm. Bruce Ezell, Jr., M.D., Cotesworth P. Fishburne, Jr., D.D.S., Herbert C. Granger, Charles B. Hanna, M.D., Robert C. Lake, Jr., E. Conyers O'Bryan, Jr., M.D., Claudia W. Peeples, Harrison L. Peeples, M.D., Philip D. Sasser and Alan E. Stalvey, Respondents.

No. 24694.

Supreme Court of South Carolina.

Heard May 7, 1997.

Decided Sept. 22, 1997.

Rehearing Denied Oct. 23, 1997.

56

Ellis I. Kahn and Justin S. Kahn of Kahn Law Firm, Charleston, for appellant.

Richard S. Rosen, Morris D. Rosen, and Alex B. Cash, of Rosen, Rosen & Hagood, and Joseph C. Good, Jr., Charleston, for respondents.

BURNETT, Justice:

Appellant Paul Ross, M.D., seeks judicial review under the Administrative Procedures Act (the APA)[1] of the termination of his tenured position by Respondent Medical University of South Carolina (MUSC). Dr. Ross contends multiple and overlapping errors at all levels in the process of his termination resulted in denial of his procedural due process rights in violation of the United States and South Carolina Constitutions.[2] The circuit court affirmed the termination. We affirm as modified.

## PROCEDURAL HISTORY

Dr. Ross was a tenured professor at MUSC. In 1989, his employment was terminated by James Edwards, President of MUSC. Pursuant to the procedures set forth in the MUSC faculty handbook, Dr. Ross requested and received a hearing before a Faculty Hearing Committee (Committee). The Committee recommended Dr. Ross' termination be upheld. In accordance with the handbook procedures, the Vice–President

---

1. S.C.Code Ann. §§ 1–23–310 to –400 (1986).

2. U.S. Const. amend. XIV, § 1; S.C. Const. art. I, § 3.

for Academic Affairs, Marcus Newberry, reviewed the Committee's recommendation and rationale and concurred in the termination. Thereafter, the Board of Trustees (the Board) granted review and, after hearing argument from counsel for both Dr. Ross and MUSC, unanimously voted to uphold Dr. Ross' termination.[3] After taking additional evidence, the circuit court concluded, *inter alia,* Dr. Ross' termination was supported by substantial evidence and his due process rights were not violated.

## EVIDENCE BEFORE COMMITTEE

The following evidence was presented during the seven-day hearing before the Committee in September 1989. In 1975, Dr. Ross was hired by MUSC as a tenured professor and the Chairman of the Department of Radiology (the Department). Like other faculty, Dr. Ross' income was comprised of a base salary, supplemented by funds distributed from a professional fee account. Funds for the professional fee account were generated by clinical work performed by the Department faculty.

The Department received funding directly from MUSC and from the professional fee account. As Chairman, Dr. Ross had authority to distribute the Department's funds for Departmental salaries, research, and expenses as he saw fit. Dr. Ross agreed he was accountable for the distribution. MUSC administration agreed Department faculty would not be informed of Dr. Ross' income.

In 1982, Dr. Ross' net income was $392,702. The Acting Dean of the School of Medicine advised Dr. Ross he was concerned about the level of the doctor's income. Over the next few years, Dr. Ross' income increased to $662,556. In 1985, the Vice–President for Academic Affairs warned Dr. Ross about his high income. At times, MUSC reduced the direct funding for the Department to force Dr. Ross to

---

3. After receiving notification the Board concurred with the Committee's recommendation, Dr. Ross filed an action in circuit court alleging due process violations, breach of contract, accord and satisfaction, defamation, and seeking judicial review under the APA. MUSC removed the action to federal court. The federal court remanded Dr. Ross' petition for judicial review under the APA to the circuit court and held the remaining causes of action in abeyance.

allocate more of the professional fees for Departmental purposes, rather than to his personal income.

In 1986, the Dean of the School of Medicine notified Dr. Ross his total income could not exceed the 80th percentile of income for radiology professors as reported by the Association of American Medical Colleges times 1.2%. The Dean instructed Dr. Ross to resign as Chairman of the Department. Dr. Ross submitted his resignation in mid–1988 and then went on sabbatical. His resignation as Chairman was effective on February 1, 1989. Between 1980 and 1988, Dr. Ross allocated to himself over $2,000,000 more than the average medical school department chairman.

Shortly after Dr. Ross' resignation as Chairman, the Department faculty met with Vice–President Newberry and expressed concern over the direction of the Department. The faculty informed Vice–President Newberry it had discovered the level of income Dr. Ross had distributed to himself from funds generated by the Department as a whole. The faculty was upset because Dr. Ross had maintained MUSC administration had denied the Department adequate funding for their academic endeavors and because he had allocated available funds to his personal income.

Vice–President Newberry spoke with Dr. Ross about his income and the faculty's concerns on at least three occasions between February 9 and the end of March 1989. At these meetings, Vice–President Newberry informed Dr. Ross Department faculty members were demoralized by his presence and preferred he leave MUSC.

By letter dated and personally delivered to Dr. Ross on March 29, 1989, Vice–President Newberry notified Dr. Ross of complaints he had received and charged he had:

repeatedly violated Article X, III(B) of the [MUSC] handbook by conduct seriously prejudicial to [MUSC] through infractions of commonly accepted standards of behavior in academic and professional communities. Specifically, it is alleged that you misused your position as Department Chairman for personal gain by unfairly compensating yourself in relationship to your actual contributions to the department's earnings. You knowingly allocated [professional account] monies in such a manner as to unfairly penalize

your departmental employees while knowingly raising your level of compensation to a point far exceeding that of any M.D. at [MUSC] and exceeding nationally accepted levels. These actions continued even after warnings from the administration.

This letter concluded by stating Vice–President Newberry would appoint a peer review committee to investigate these allegations. Vice–President Newberry testified he tried to resolve the matter with Dr. Ross by offering him the option of resigning in lieu of appointing a peer review committee.

On April 5, 1989, Dr. Ross met with Vice–President Newberry; he refused to resign. Thereafter, Vice–President Newberry discussed the situation with the General Counsel for MUSC. The two reviewed the MUSC faculty handbook and determined, rather than appointing a peer review committee, the matter should be brought to President Edwards' attention.

President Edwards testified he independently investigated Dr. Ross' conduct. By letter dated April 13, 1989, President Edwards notified Dr. Ross he was guilty of conduct seriously prejudicial to MUSC and terminated his employment. In response to a letter from Dr. Ross' counsel, President Edwards wrote Dr. Ross on April 20, 1989, delineating the particular charges of misconduct.

Other testimony before the Committee indicated faculty members recruited by Dr. Ross were paid less than radiologists in the 50th percentile of the Association of American Medical Colleges. Faculty members left the Department because of lack of money. In 1987, Dr. Ross told a faculty member there were no additional funds for raises and his (Dr. Ross') own salary was directly controlled by the Dean.

A faculty member testified Dr. Ross performed clinical work one-half to one day per week and read scans approximately one to one and one-half hours per day. He explained, at that rate, it was impossible for Dr. Ross to have generated the income he collected as professional fees. Nonetheless, Dr. Ross had the highest income at MUSC.

President Edwards testified Dr. Ross' conduct irreparably damaged MUSC and resulted in MUSC losing $500,000 in known donations. Various witnesses testified Dr. Ross' con-

duct significantly deviated from standard practice in academic administration, was improper, was unethical, and was seriously prejudicial to MUSC.

## ISSUES

I. Did the circuit court err by concluding the APA did not apply to the grievance procedure at MUSC?

A. Did Dr. Ross receive notice as required by the APA?

B. Was Dr. Ross improperly prohibited from taking discovery under the APA?

C. Do the Board's findings of fact and conclusions of law comply with the APA?

II. Did the circuit court err by concluding Dr. Ross' due process rights were not violated because he was afforded an adequate pretermination hearing?

III. Did MUSC violate South Carolina Constitution article I, § 22?

IV. Did the circuit court err by concluding Dr. Ross was required to establish he was prejudiced by certain *ex parte* communications between employees of MUSC?

V. Did the circuit court err by issuing its own findings of fact and conclusions of law?

### I. Applicability of APA to Grievance Proceedings

While his petition for judicial review was pending, Dr. Ross served discovery on MUSC. MUSC refused to respond and was held in contempt. On appeal of the contempt order, this Court determined, pursuant to provisions in the APA, the circuit court, sitting as the reviewing court, had the discretion to order discovery and to admit extrinsic evidence concerning alleged irregularity in the agency proceeding.[4] In addition, the Court concluded *ex parte* communications between MUSC's General Counsel and Vice–President Newberry violated provisions of the APA. Accordingly, the Court affirmed the circuit court's jurisdiction to order discovery and remanded the matter for further proceedings under the APA. *Ross*

---

4. Section 1–23–380(f) provides for discovery on review of an action under the APA where there are alleged procedural irregularities which do not appear in the record.

*v. Medical University of South Carolina*, 317 S.C. 377, 453 S.E.2d 880 (1994) (*Ross I* ).

Dr. Ross contends the circuit court was bound by *Ross I* as the law of the case and, therefore, erred by concluding the APA did not apply to MUSC's grievance proceedings. We agree.

■ The doctrine of the law of the case prohibits issues which have been decided in a prior appeal from being relitigated in the trial court in the same case. 5 Am.Jur.2d *Appellate Review* § 605 (1995). The law of the case applies both to those issues explicitly decided and to those issues which were necessarily decided in the former case. *Nelson v. Charleston & Western Carolina Railway Co.*, 231 S.C. 351, 357, 98 S.E.2d 798, 800 (1957) (where Court granted a new trial in first appeal for errors in the charge, it logically determined trial court had not erred in refusing defendant's motion for a directed verdict "for if there had been error in this respect it would have been unnecessary to consider any other questions");[5] *see also Warren v. Raymond*, 17 S.C. 163 (1882) (all points decided by the Court on appeal, or necessarily involved in what was decided, are res judicata and cannot be considered again in the cause).

■ In *Ross I*, the Court specifically determined the lower court had discretion under provisions of the APA to order discovery concerning alleged irregularities in the grievance proceedings at MUSC and, during the grievance process, MUSC's General Counsel and Vice–President had violated provisions of the APA prohibiting *ex parte* communication. In arriving at these conclusions, the Court necessarily decided the APA was applicable to MUSC's grievance proceedings. The lower court was bound by this decision as the law of the case. Accordingly, the lower court erred by concluding the

---

5. 21 C.J.S. *Courts* § 143 (1990) ("*[a]n adjudication on any point within the issues presented by the case cannot be considered a dictum, and this rule applies as to all pertinent questions, although only incidentally involved, which are presented and decided in the regular course of the consideration of the case, and lead up to the final conclusion, and to any statement in the opinion as to a matter on which the decision is predicated.*") (Emphasis added).

APA did not apply to the grievance proceedings before MUSC.

## A. *Notice under the APA*

Two months prior to the hearing, Dr. Ross requested the Committee order MUSC to provide more specific information regarding the charges against him. The Committee denied this request. Dr. Ross contends the Committee's failure to grant his motion violated the notice provision of § 1–23–320(b)(4). We disagree.

Section 1–23–320(a) requires all parties to be afforded an opportunity for hearing after notice. Notice includes: (1) a statement of the time, place, and nature of the hearing; (2) a statement of the legal authority and jurisdiction under which the hearing is to be held; (3) reference to the particular sections of the statutes and rules involved; and (4) a short and plain statement of the matters asserted. § 1–23–320(b). Section 1–23–320(b)(4) provides, "[i]f the agency or other party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved. Thereafter, upon application, a more definite and detailed statement shall be furnished."

MUSC provided Dr. Ross with notice of the matters asserted (the reasons for his termination) in compliance with § 1–23–320(b)(4). Vice–President Newberry's letter of March 29, 1989, stated the alleged misconduct and referred to the particular sections of the MUSC faculty handbook the conduct was alleged to have violated. President Edwards' letter of April 13, 1989, terminating Dr. Ross' employment also stated the nature of Dr. Ross' misconduct and referred to specific sections in the faculty handbook the conduct was alleged to have violated. Further, by letter of April 20, 1989, President Edwards responded to Dr. Ross' request for a more detailed statement and provided detailed allegations of misconduct, the effect of the misconduct on MUSC, and statutory provisions the misconduct was alleged to have violated. Dr. Ross was fully and fairly apprised of the matters asserted in such time and manner so as to be able to meaningfully respond at the hearing. Accordingly, the Committee did not err by denying

Dr. Ross' request for more specific information regarding the charges against him. We find no error.

## B. *Discovery under the APA*

Dr. Ross argues the Committee violated the APA by refusing to compel the deposition of a representative from MUSC and refusing to subpoena television footage covering his termination.

Under the APA, any party to a contested proceeding may depose witnesses in accordance with the provisions which apply in civil actions. § 1–23–320(c). In addition, the agency hearing the contested case has the power to issue subpoenas for the attendance of witnesses and production of records. § 1–23–320(d).

At the motion hearing, the Committee denied Dr. Ross' request for an order compelling the deposition of a representative of MUSC. The Committee also denied Dr. Ross' request to subpoena television footage covering his termination.

While the Committee had the authority to compel the requested deposition and subpoena the requested television footage, we conclude Dr. Ross' rights were not substantially prejudiced by the Committee's denial of these requests. Dr. Ross took full advantage of the opportunity to cross-examine the witnesses presented on behalf of MUSC. He has not established his inability to depose a representative of MUSC or gain access to television footage substantially hindered his ability to respond to the charges against him. Accordingly, Dr. Ross was not prejudiced by the Committee's denial of these motions. Section 1–23–380(g) (on appeal under the APA, the reviewing court may reverse the decision if substantial rights of the appellant have been prejudiced because the administrative findings are in violation of statutory provisions).

## C. *The Board's Findings of Fact & Conclusions of Law*

Dr. Ross asserts the Board, the final decisionmaker in MUSC's grievance procedure, failed to issue adequate findings of fact and conclusions of law as required by the APA. We disagree.

Section 1–23–350 provides: "[a] final decision or order adverse to a party in a contested case shall be in writing or stated in the record. A final decision shall include findings of fact and conclusions of law, separately stated."

The Board issued a letter stating, "[a]fter fully reviewing the complete record of the [Committee] proceedings, after oral arguments before the Board by counsel, and after due deliberation, [the Board] voted unanimously to uphold the termination of [Dr. Ross]." The lower court concluded the Board adopted the Committee's findings of fact and conclusions of law.[6]

We find no error as a result of the Board's failure to issue its own findings of fact and conclusions of law. Since the Board agreed with the recommendation of the Committee, it was unnecessary for the Board to restate the analysis and conclusion in its own order. Moreover, Dr. Ross has not established any prejudice from failure of the Board to draft its own findings of fact and conclusions of law. Section 1–23–380(g) (on appeal under the APA, the reviewing court may reverse the decision if substantial rights of the appellant have been prejudiced because the administrative findings are in violation of statutory provisions).

## II. *Adequacy of Pretermination Hearing*

Dr. Ross contends the trial judge erred by concluding he received an adequate pretermination hearing before he was discharged. We agree.

The Due Process Clause of the Fourteenth Amendment provides "nor shall any state deprive any person of life, liberty, or property without due process of law ...". U.S. Const. amend. XIV, § 1. Similarly, the South Carolina Constitution provides no "person [shall] be deprived of life, liberty,

---

6. Dr. Ross does not seriously contest the adequacy of the Committee's findings of fact and conclusions of law. To the extent he does, however, challenge the Committee's order, we conclude the reasons supporting the Committee's decision are clearly set forth in its report and are sufficient to enable the reviewing court to determine whether substantial evidence exists to support Dr. Ross' termination. *Able Communications, Inc. v. South Carolina Public Service Commission*, 290 S.C. 409, 351 S.E.2d 151 (1986).

or property without due process of law . . .". S.C. Const. art. I, § 3. A tenured professor has a property interest in continued employment which is safeguarded by due process. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *cf. Storrer v. University of South Carolina,* 288 S.C. 555, 343 S.E.2d 664 (Ct.App.1986) (South Carolina Constitution does not require notice and hearing comporting with due process prior to the non-renewal of a non-tenured professor's contract).

All the process which is due is a pretermination opportunity to respond and a post-termination procedure. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). "Some kind of hearing" is required prior to the discharge of an employee who has a constitutionally protected property interest in employment. However, a full evidentiary hearing is not required prior to termination. *Id.; Arnett v. Kennedy* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Instead, a tenured employee is entitled to 1) oral or written notice of the charges against him, 2) an explanation of the employer's evidence, and 3) opportunity to present his explanation. *Loudermill, supra.*

> [T]he pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true *and support the proposed action. . . .* The essential requirements of due process . . . are notice and an opportunity to respond. *The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.*

*Loudermill,* 470 U.S. at 545–46, 105 S.Ct. at 1495, 84 L.Ed.2d at 506 (emphasis added).

As a tenured employee, Dr. Ross had a property interest in continued employment at MUSC. Accordingly, he was entitled to due process, including a pre-termination hearing. *Board of Regents of State Colleges v. Roth, supra.*

MUSC asserts Vice–President Newberry's four meetings with Dr. Ross between February 9 and April 5, 1989, constituted the pretermination hearing. We question whether

meetings over a two-month period qualify as a pretermination hearing. Nonetheless, we need not resolve that issue because we find Dr. Ross was never advised MUSC administration was considering terminating his employment. Instead, the record indicates Dr. Ross was informed, if he refused to resign, a peer review committee would be appointed to investigate the allegations of misconduct. However, the peer review committee was not appointed and Dr. Ross was terminated. Since Dr. Ross was not advised MUSC was contemplating terminating his employment, he did not have an opportunity to respond to the proposed action. Therefore, MUSC did not provide Dr. Ross with a pretermination hearing. *Loudermill, supra; Cotnoir v. University of Maine Systems,* 35 F.3d 6 (1st Cir.1994).

Nonetheless, although the pretermination procedures afforded Dr. Ross did not comply with minimum due process requirements, the error was remedied by the subsequent Committee hearing. Dr. Ross received notice of a post-termination hearing, a written list of specific charges against him, and references to the sections in the faculty handbook and South Carolina Code his conduct was alleged to have violated. The hearing as originally scheduled was postponed at Dr. Ross' request. Thereafter, while represented by counsel, Dr. Ross fully participated in the seven-day hearing. He presented his own witnesses and evidence and cross-examined MUSC's witnesses. Any lack of opportunity to respond to charges in a pretermination hearing was clearly remedied by Dr. Ross' full and meaningful participation in the post-termination hearing. *Glenn v. Newman,* 614 F.2d 467 (5th Cir. 1980) (any error in pre-termination hearing cured by subsequent hearing); *Agarwal v. Regents of University of Minnesota,* 788 F.2d 504 (8th Cir.1986) (even if employee did not receive all procedural safeguards during initial proceeding, his right to due process was not violated due to later hearing); *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994) (state may cure procedural deprivation of due process rights by providing later procedural remedy); *Jones v. Chatham County,* 223 Ga.App. 455, 477 S.E.2d 889 (1996) (available post-termination procedures cured employer's failure to have pretermination hearing).

### III. *South Carolina Constitution article I, § 22*

Dr. Ross contends MUSC violated South Carolina Constitution article I, § 22. Specifically, he contends 1) neither Vice-President Newberry nor President Edwards provided him with notice or the opportunity to be heard and 2) Vice-President Newberry and President Edwards served as prosecutors and adjudicators, both in violation of article I, § 22.

In recognition of the increasing number of governmental powers delegated to administrative agencies, South Carolina Constitution article I, § 22 was added to the 1895 Constitution in 1970 "as a safeguard for the protection of liberty and property of citizens." *Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895,* p. 21 (1969). Article I, § 22 provides, in part:

> No person shall be finally bound by a judicial or quasi-judicial decision of an administrative agency affecting private rights except on due notice and an opportunity to be heard; nor shall he be subject to the same person for both prosecution and adjudication; . . . .

 We have interpreted this provision as specifically guaranteeing persons the right to notice and an opportunity to be heard by an administrative agency, even when a contested case under the APA is not involved. *Stono River EPA v. Department of Health and Environmental Control,* 305 S.C. 90, 406 S.E.2d 340 (1991). Article I, § 22 requires an administrative agency provide notice and an opportunity to be heard, but does not require notice and an opportunity to be heard at each level of the administrative process. It mandates notice and opportunity to be heard at some point before the agency makes its final decision. *See DeGroot v. Employment Security Commission,* 285 S.C. 209, 328 S.E.2d 668 (Ct.App.1985) (Employment Security Commission did not violate article I, § 22 by allowing testimony before Appeals Tribunal but not on appeal to Commission).

### A) *Dr. Edwards' Participation*

Dr. Edwards investigated Dr. Ross' conduct and then terminated Dr. Ross. Thereafter, Dr. Edwards testified against Dr. Ross at the Committee hearing.

██ While we conclude Dr. Ross was entitled to a pretermination hearing in accordance with the Fourteenth Amendment and South Carolina Constitution article I, § 3, we find article I, § 22 did not mandate Dr. Ross be provided with notice and an opportunity to be heard by Dr. Edwards. Article I, § 22 requires and administrative agency to provide notice and an opportunity to be heard prior to the agency's final decision, but does not require notice and an opportunity to be heard at each level of the administrative process. *Id.*

██ We further conclude Dr. Edwards' participation in Dr. Ross' termination did not violate the provision of article I, § 22 which prohibits the same person from serving as both prosecutor and adjudicator. First, although Dr. Edwards testified as an adverse witness against Dr. Ross at the Committee hearing, he did not later participate as an adjudicator.

██ Second, although Dr. Edwards investigated Dr. Ross' conduct and, thereafter, terminated Dr. Ross,[7] we conclude this is not the investigatory/adjudicatory situation article I, § 22 intended to prohibit. Instead, we find the purpose of article I, § 22 is to ensure adjudications are conducted by impartial administrative bodies. *See Babcock v. Office of Audits, supra* note 7 (due process requires an impartial decisionmaker). Partiality exists where, among others, an adjudicator either has *ex parte* information as a result of prior investigation or has developed, by prior involvement with the case, a "will to win." *See Grolier, Inc. v. Federal Trade Commission,* 615 F.2d 1215 (9th Cir.1980) (federal APA prohibits person from serving as adjudicator where, by prior involvement with case, he has obtained *ex parte* information or had a "will to win"). Here, there is no evidence Dr. Edwards' initial decision to terminate Dr. Ross was not impartial. Dr. Edwards had no access to information which he obtained as a result of his investigation but which he should not have considered in making his decision regarding Dr. Ross' employment. Further, there is no evidence Dr. Edwards' personal investigation prevented him from making an objective decision

---

7. In *Babcock Center, Inc. v. Office of Audits,* 286 S.C. 398, 334 S.E.2d 112 (1985), the Court included investigatory activity with prosecutorial activity.

regarding Dr. Ross' employment. We find no constitutional violation.

### B) *Vice–President Newberry's Participation*

Vice–President Newberry investigated the faculty complaints against Dr. Ross, testified as an adverse witness at the Committee hearing, and sat as the intermediate judge in the three-step disciplinary procedure. In his role as intermediate decisionmaker, Vice–President Newberry was not required by article I, § 22 to provide Dr. Ross with notice and an opportunity to be heard during his consideration of the Committee's recommendation. Dr. Ross was given due notice and an opportunity to be fully heard during the Committee proceeding. *DeGroot v. Employment Security Commission*, 285 S.C. 209, 328 S.E.2d 668.

However, Vice–President Newberry's participation as both prosecutor and adjudicator clearly violated the provision of article I, § 22 which prohibits the same person from serving in these dual capacities. Having participated as a witness in the Committee hearing, Vice–President Newberry was prohibited from reviewing the Committee's decision.

Nonetheless, while we do not condone Vice–President Newberry's participation in this dual capacity, we find the error harmless. After Vice–President Newberry concurred in the Committee's recommendation, the Board reviewed the record of the hearing before the Committee, heard oral argument from the parties, and conducted its own deliberations. The Boards' independent consideration of Dr. Ross' grievance cured the constitutional violation.[8] *See Schaper v. City of Huntsville*, 813 F.2d 709 (5th Cir.1987) (alleged conspiracy at pretermination procedure did not violate due process rights where employee had right to appeal termination); *Davis v. Mann*, 721 F.Supp. 796 (S.D.Miss.1988) (where there is an adequate appeal process, bias on part of initial decisionmaker is not denial of procedural due process).

---

8. Dr. Ross contends the Board's consideration and ruling on his grievance could not cure this due process violation because the Board's review was also defective since it had the Committee's "Comments." In that Dr. Ross did not establish the "Comments" affected the decision of the Board, this argument is without merit. *See* Part IV.

## IV. *Ex Parte Communications*

Dr. Ross argues two *ex parte* communications during the grievance procedure violated his due process. Specifically, he contends A) the Committee's distribution of its "Comments" to outside counsel for MUSC, Vice–President Newberry and the Board, but not to himself, and B) Vice–President Newberry's communication with MUSC General Counsel during his consideration of the Committee's recommendation violated § 1–23–360 and due process. Dr. Ross claims he was not required to establish the *ex parte* communications resulted in prejudice. We disagree.

Section 1–23–360 provides:

Unless required for the disposition of *ex parte* matters authorized by law, *employees of an agency assigned to render a decision* or to make findings of fact and conclusions of law in a contested case *shall not communicate,* directly or indirectly, *in connection with any issue of fact,* with any person or party, nor *in connection with any issue of law, with any party or his representative,* except upon notice and opportunity for all parties to participate.

(emphasis added). Criminal sanctions may be imposed for violations of § 1–23–360.

### A. *Committee's "Comments"*

After deliberations, the Committee prepared a five-page report. The first four pages of the report were entitled "Decision and Rationale." In its conclusion, the "Decision and Rationale" states: "[a]ccordingly, although the committee had concerns about the actions of MUSC administrators in this matter, it recommends to the Vice–President for Academic Affairs that the grievance appeal by Dr. Ross be dismissed."

The fifth page was entitled "Comments." The "Comments" state MUSC knew of Dr. Ross' excessive personal income yet allowed an inordinate length of time to elapse before taking "precipitous action." The "Comments" recognized MUSC's arrangement with Dr. Ross permitted his self-serving conduct and called for adequate oversight and accountability by MUSC administration.

The Committee instructed its counsel to distribute the "Decision and Rationale," along with a transcript of the hear-

ing and other matters, to counsel for Dr. Ross, outside counsel for MUSC, and Vice–President Newberry. The Committee instructed its counsel to distribute the "Comments" to outside counsel for MUSC, and Vice–President Newberry, but not to counsel for Dr. Ross. Committee Counsel testified the Committee believed the four-page document constituted its decision on Dr. Ross' termination. Committee counsel explained the "Comments" were the Committee's criticism of MUSC's handling of Dr. Ross' termination and were prepared for MUSC administration. Committee Counsel agreed the "Comments" were helpful to Dr. Ross because they were critical of the administration. The "Comments" were forwarded to the Board.

During argument before the Board, outside counsel for MUSC referred to the "Comments," stating:

> Because in addition to finally ruling they [the Committee] sent the administration a message that listen, we think you are right in this case but you could have done it better. I mean they weren't afraid of the administration, these people on that committee.

At this point, Dr. Ross learned of the existence of the "Comments." [9]

■ The Committee members were employees of MUSC assigned to render a decision. In this position, they were prohibited by § 1–23–360 from communicating *ex parte* with any party or party's counsel about any issue of fact or law. Although the Committee characterized its "Comments" as mere criticism, the "Comments" clearly express the Committee's findings as to MUSC's conduct in this matter and, therefore, address factual issues. We conclude the Committee's distribution of its "Comments" to outside counsel for MUSC, but not to Dr. Ross or his counsel, violated § 1–23–360. Furthermore, apart from the APA, the Committee's failure to distribute its "Comments" to Dr. Ross while distributing the "Comments" to outside counsel for MUSC, Vice–

---

9. As noted above, because Dr. Ross alleged there were irregularities in the procedure which did not appear on the record, the circuit court allowed discovery and took evidence regarding the alleged irregularities. *See Ross I, supra.* The testimony regarding the "Comments" and other *ex parte* communication was heard by the circuit court.

President Newberry, and eventually to the Board was *ex parte* communication.

 Nonetheless, although the Court condemns *ex parte* communication, it has refused to adopt a *per se* rule automatically reversing rulings which result from *ex parte* communications. Instead, the Court considers whether prejudice results from the *ex parte* contact. *Burgess v. Stern,* 311 S.C. 326, 428 S.E.2d 880 (1993).

 Dr. Ross has not established any prejudice from not receiving a copy of the "Comments." While the "Comments" offer a more thorough explanation of the Committee's criticism of MUSC's administration, the "Decision and Rationale" which Dr. Ross did receive also expresses the Committee's concern about the administration's actions. Dr. Ross has not shown receipt of the "Comments" by Vice–President Newberry or the Board influenced the decisions of those adjudicators. Since Dr. Ross has not established any prejudice from not receiving the "Comments," the error is harmless. *Id.; Tall Tower, Inc. v. South Carolina Procurement Review Panel,* 294 S.C. 225, 233, 363 S.E.2d 683, 687 (1987) (in an administrative proceeding, "[a] demonstration of substantial prejudice is required to establish a due process claim"); *Palmetto Alliance, Inc. v. Public Service Commission,* 282 S.C. 430, 319 S.E.2d 695 (1984) (proof of denial of due process in administrative proceeding requires showing of substantial prejudice).

### B. *Vice–President Newberry's Communication with MUSC General Counsel*

Along with outside counsel, MUSC General Counsel represented MUSC before the Committee. After receipt of the Committee's recommendation and reaching his own conclusion, Vice–President Newberry asked MUSC General Counsel about the grievance procedure and to draft a letter reflecting his (Newberry's) decision agreeing with the recommendation of the Committee. MUSC General Counsel drafted a letter for Vice–President Newberry; Vice–President Newberry signed and distributed the letter. By failing to respond to Dr. Ross' discovery, the circuit court deemed MUSC admitted Vice–President Newberry and MUSC General Counsel discussed the Committee's "Comments." *Ross I, supra.*

 Under § 1–23–360, Vice–President Newberry, an employee of MUSC assigned to render a decision, was prohibited from discussing Dr. Ross' case *ex parte* with MUSC's General Counsel. *Ross I, supra.* Nonetheless, Dr. Ross has not shown any prejudice by the *ex parte* contact. The record indicates Vice–President Newberry had reached his decision concerning the Committee's recommendation before communicating with MUSC General Counsel. MUSC General Counsel was merely the scribe who forwarded Vice–President Newberry's concurrence to the parties. The letter drafted by MUSC General Counsel simply stated Vice–President Newberry concurred in the Committee's recommendation and informed Dr. Ross of the procedure for appeal. The letter does not set forth findings of fact and conclusions of law. Accordingly, although improper, Vice–President Newberry's communication with MUSC General Counsel did not prejudice Dr. Ross and, therefore, is not reversible error. *Burgess v. Stern, supra; Tall Tower, Inc. v. South Carolina Procurement Review Panel, supra; Palmetto Alliance, Inc. v. Public Service Commission, supra.*

## V. *Circuit Court's Order*

Dr. Ross contends the circuit court erred by issuing extensive findings of fact and conclusions of law when MUSC failed to do so. We disagree.

After stating the relevant factual background of this matter, the lower court's order addressed Dr. Ross' various appellate issues. In addition, the order addressed Dr. Ross' challenge to the alleged procedural irregularities which he claimed did not appear in the record of the grievance proceeding and on which the circuit court permitted discovery and heard evidence. Moreover, we note this argument is disingenuous: Dr. Ross' proposed order to the circuit court is thirty pages in length and contains references to testimony and his conclusions based on the evidence.

## CONCLUSION

Although we have found errors in the process of Dr. Ross' termination, we conclude, as a whole, Dr. Ross was provided with sufficient notice and opportunity to meaningfully respond

to the allegations presented by MUSC. Accordingly, the decision of the trial judge is affirmed as modified.

FINNEY, C.J., and TOAL, MOORE and WALLER, JJ., concur.