536 S.E.2d 892

**VULCAN MATERIALS COMPANY, Putnam Properties, Inc., Allen M. Knight, and The Timmerman Family Partnership, Respondents,**

v.

**GREENVILLE COUNTY BOARD OF ZONING APPEALS and the County of Greenville, Appellants.**

No. 3237.

Court of Appeals of South Carolina.

Heard Dec. 8, 1999.

Decided Aug. 7, 2000.

482

Donald A. Harper and Cynthia Buck Brown, both of The Harper Law Firm, of Greenville, for appellants.

Larry D. Estridge, of Womble, Carlyle, Sandridge & Rice; and Gregory J. English, of Wyche, Burgess, Freeman & Parham, both of Greenville, for respondents.

CURETON, Judge:

In this zoning appeal, the Greenville County Board of Zoning Appeals (Board) challenges the circuit court's order to issue Vulcan Material Company a Certificate of Occupancy so Vulcan may implement its mine development plan as a nonconforming use. We affirm.

## FACTS

In 1989, Vulcan began to explore the possibility of mining granite in Greenville County. To that end, Vulcan leased three tracts of land from three different owners: the Timmerman Family Trust, Allen Knight, and James Putnam.[1] Aggregately, the leased properties are known as the Princeton site.

To assess the quantity and quality of the Princeton site's granite deposit, Vulcan extracted 360 granite samples from the site beginning sometime in 1990. These samples were analyzed by geologists who produced an initial assessment of the deposit on January 24, 1992. Vulcan expended nearly a million dollars to extract and analyze the samples.

Vulcan's mining engineers utilized the geologist's assessment to prepare a mining development plan for the site. After several revisions and additional sampling, the mining plan was finalized in June or July of 1995.

While the mining plan was being developed, Vulcan simultaneously pursued the various permits and studies required by state and federal regulators to mine the site. These efforts produced the following results: (1) an archeological survey of the site, completed in June of 1996; (2) an air permit application, submitted in July of 1995;[2] (3) an NPDES[3] draft discharge permit, obtained in November of 1995; (4) a protected species survey, completed in May of 1996; (5) a wetlands' delineation, approved in November of 1995; and (6) a draft wastewater treatment permit, issued in November of 1995. Additionally, Vulcan applied for a mine operating permit from the South Carolina Department of Health and Environmental Control (DHEC) in July of 1995. After reviewing the permit application, DHEC indicated it would issue Vulcan a mine operation permit as soon as this zoning litigation was resolved.

By 1994, Vulcan had identified a portion of the 585 acre Princeton site where it planned to extract granite. Naturally,

---

1. Putnam later formed Putnam Properties, Inc. to hold his lease.

2. DHEC indicated they would issue the air permit if Vulcan ever began mining the Princeton site.

3. National Pollutant Discharge Elimination System (NPDES).

the timber, topsoil, and rock layers which covered the granite deposit had to be removed before extraction could begin, so Vulcan arranged for the site's owners to harvest the timber from atop the deposit and for Thrift Brothers, Inc. to remove the covering layers of soil and rock, known as overburden. Ordinarily, Vulcan would have removed the overburden itself; however, in this case, Vulcan allowed Thrift to remove the overburden on Vulcan's behalf. The arrangement was mutually beneficial as Vulcan needed the overburden removed to expose the granite it sought and Thrift needed the extracted soil and rock in a near-by highway project. As both parties benefitted from the arrangement, no other compensation was exchanged.

Thrift utilized the overburden to improve State Highway 25 pursuant to a contract with the South Carolina Department of Transportation. Because the excavation of rock and soil for a highway project, known as a borrow pit operation,[4] does not require a mining permit, Thrift was able to remove the overburden before Vulcan obtained its mine operating permit.

Although' Thrift's only concern was the operation of a borrow pit, Vulcan ensured Thrift's actions supported its mining operation. Originally, Thrift wanted to establish the borrow pit as close as possible to Highway 25 to reduce its transportation costs, but Vulcan insisted Thrift limit its borrow pit to that area which covered the granite deposit Vulcan planned to extract. Thrift operated the borrow pit from October, 1994 until August, 1995. In all, approximately fifteen acres of overburden were removed to a depth of between 25 to 35 feet. After the overburden was removed, Vulcan hired a contractor to grade the site and seed it to control erosion. Vulcan also established a retention pond and installed a silt-fence around the borrow pit. By the end of this process, a pit of more than two acres remained with outcroppings of granite still exposed. By July of 1996, Vulcan had invested approximately $1,900,000 in the Princeton site.

---

4. A "borrow pit" is defined as "an area from which soil or other unconsolidated materials are removed to be used, without further processing, for highway construction or maintenance." S.C.Code Ann. § 48–20–40(16) (Supp.1999).

In early 1996, community opposition to the Princeton site began to develop. When DHEC conducted a public hearing on Vulcan's mine operating permit in April, 1996, local residents voiced their concern over the effects of the mine on the local groundwater. DHEC responded by ordering Vulcan to perform a hydrology study to predict the mine's impact on local groundwater elevations.[5]

On May 23, 1996, the Dunklin Homeowner's Association held a meeting to explore the possibility of prohibiting mining at the Princeton site by having the site zoned for residential use only. Jimmy Forbes, the executive director of the Greenville County Planning Commission, attended the homeowner's meeting and opined that zoning could not stop the mine because "Vulcan already had a vested interest in the [site]." Nevertheless, the homeowner's association initiated a campaign to have the site zoned residential. On August 6, 1996, the Greenville County Council imposed a moratorium on building permits at the Princeton site, thereby preventing Vulcan from constructing an office. In September, 1996, the Greenville County Planning Commission, working with the homeowner's association, recommended to County Council the area in which the Princeton site is located be zoned R–S for residential/suburban use only. County Council subsequently zoned the property R–S. However, the Commission noted that its "staff told the [homeowner's association] that zoning may not stop the rock quarry from occurring."

On November 11, 1996, Vulcan applied for a Certificate of Occupancy for a Nonconforming Use so it could mine the site despite the zoning. Peter Nokimos, the Greenville County Zoning Administrator, denied Vulcan's application on March 3, 1997. Vulcan appealed Nokimos's decision to the Board, which held a full hearing into the matter on July 16, 1997. At that hearing, Nokimos testified he denied Vulcan's application because he found no indication of any mining or occupancy at the site. The Board continued its deliberations until a subsequent hearing on August 13, 1997, at which time it voted to uphold Nokimos's refusal to issue the certificate.

---

5. The study was initially completed on November, 14, 1996, and approved by DHEC in February, 1997.

The Greenville County Code Enforcement Officer informed Vulcan of the Board's decision to uphold the denial of the Certificate of Occupancy in a letter dated August 18, 1997. Vulcan appealed the Board's decision to the circuit court on September 17, 1997. After Vulcan filed its appeal, the Board's chairman and secretary issued a document which purported to be the Board's "Final Decision and Order" in this matter. The document was dated October 23, 1997, and signed by the chairman and secretary.[6]

On February 19, 1998, the circuit court reversed the Board's decision and ordered it to issue Vulcan a certificate of occupancy. The court held that the "Board's decision is based upon numerous errors of law and there is no evidence to support any basis for denying Vulcan a Certificate of Occupancy." The Board appeals.

## LAW/ANALYSIS

### Standard of Review

In 1994, the Legislature enacted a new statutory scheme for local planning and zoning entities embodied in Title 6, Chapter 29, which replaced the existing scheme found in portions of Title 6, Chapter 7, and elsewhere. Act No. 355, § 2, 1994 S.C.Acts 4036, *amended by* Act No. 15, § 1, 1999 S.C.Acts 37. The new scheme imposed a standard of review whereby "[t]he findings of fact by the [zoning] board of appeals shall be treated in the same manner as a finding of fact by a jury...." S.C.Code Ann. § 6–29–840 (Supp.1999). Local zoning programs could adopt the new standard promulgated by § 6–29–840 any time prior to December 31, 1999, after which time its adoption became mandatory. *See* Act No. 355 ("On or after December 31, 1999, all local planning programs must be in conformity with the provisions of this act. Until December 31, 1999, this act is cumulative and may be implemented at any time."). Section 6–29–840 differs textually from it predecessor, which treated "[t]he findings of fact by the [zoning] board of appeals [as] final and conclusive on ... appeal." S.C.Code Ann. § 6–7–780 (1977) (repealed 1999).

---

6. Another version of the document containing the same text, but with a signature block for the chairman and each board member, was also drafted. This alternative version remains unsigned and undated.

We have repeatedly held that the old statute, § 6–7–780, imposed an "any evidence" standard of review. "The factual findings of the [b]oard (of zoning appeals) must be affirmed ... if they are supported by *any evidence*...." *Stanton v. Town of Pawleys Island,* 317 S.C. 498, 502, 455 S.E.2d 171, 172 (1995) (emphasis added); *accord Fairfield Ocean Ridge, Inc. v. Town of Edisto Beach,* 294 S.C. 475, 366 S.E.2d 15 (Ct.App.1988); *Bailey v. Rutledge,* 291 S.C. 512, 354 S.E.2d 408 (Ct.App.1987). The new statute, § 6–27–840, is also very deferential to a board's findings of fact as it equates them to a jury's findings. "[T]he factual findings of the jury will not be disturbed unless a review of the record discloses that there is *no evidence* which reasonably supports the jury's findings." *Sterling Dev. Co. v. Collins,* 309 S.C. 237, 240, 421 S.E.2d 402, 404 (1992) (emphasis added) (citing *Townes Assoc's, Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976)). The distinction, if any, between an "any evidence" and a "no evidence" standard is of little importance to the instant action as our decision, like that of the circuit court, is controlled by an issue of law.

■ Under both the old and new statutes, this Court determines "whether the decision of the board is correct as a matter of law." *Compare* § 6–7–780, *with* § 6–29–840; *see also Peterson Outdoor Advertising v. City of Myrtle Beach,* 327 S.C. 230, 235, 489 S.E.2d 630, 633 (1997) ("[T]he decision of the zoning board will not be upheld where it is based on errors of law, ... or where there is no legal evidence to support it, or where the board acts arbitrarily or unreasonably, ... or where, in general, the board has abused its discretion.") (quoting *Hodge v. Pollock,* 223 S.C. 342, 348, 75 S.E.2d 752, 755 (1953)).

### Timeliness of Vulcan's Appeal

■ The time period in which an appeal from a zoning board's decision must be raised to the circuit court varies slightly between the old and new statutory schemes. While both require an appeal to be "filed within thirty days after the decision of the board," the old statutory scheme, starts the 30-day clock after a decision is *"rendered,"* whereas the new statutory scheme, starts the clock after the decision has been *"mailed." Compare* S.C.Code Ann. § 6–7–750 (19770) (em-

phasis added), *with* § 6–29–820 (Supp.1999) (emphasis added). Obviously, a difference arises whenever the zoning board's decision is not rendered and mailed on the same day, as was the case in the action *sub judice.*

■ Initially, neither party contested the trial court's use of the new statutory scheme in its order. However, after we asked the parties to brief the timeliness issue, the Board abandoned the new scheme for the old, so it could argue that Vulcan's appeal was not timely because it was filed on September 17th, more than thirty days after the Board *rendered* its decision on August 13th.[7] We hold Vulcan's appeal was timely.

The Board operates pursuant to the Greenville County Zoning Ordinance. Greenville County, S.C., Board of Zoning Appeals By–Laws § I (1996). The zoning ordinance in effect at the time of Vulcan's appeal provided in pertinent part that "[e]very decision of the Board of Zoning Appeals shall be subject to review by a court of record in the manner provided by the laws of the state of South Carolina and particularly by ... S.C.Code *Title 6, Chapter 29.*" Greenville County, S.C., Zoning Ordinance § 9:7 (1996) (emphasis added).

■ The adoption of a zoning ordinance is a legislative function. *City of Myrtle Beach v. Juel P. Corp.,* 337 S.C. 157, 522 S.E.2d 153 (Ct.App.1999). Therefore, we review a zoning ordinance to give it a "practical, reasonable and fair interpretation consonant with the purposes, design, and policy of the lawmakers." *Id.* at 177, 522 S.E.2d at 164 (quoting *Restaurant Row Assocs. v. Horry County,* 327 S.C. 383, 391, 489 S.E.2d 641, 645 (Ct.App.1997)); *accord Charleston County*

---

7. There is no merit to the Board's assertion that it "has consistently argued that ... the appropriate statute to apply was South Carolina Code, Title 6, Chapter 7." The Board abandoned the old statutory scheme in its final brief to this Court by arguing that "[t]he standard of review to be applied ... is found in S.C.Code Ann. § 6–29–840." *Taylor v. Medenica,* 331 S.C. 575, 503 S.E.2d 458 (1998) (an issue not argued in a brief is abandoned). Nevertheless, the timeliness of an appeal from a zoning board's decision is a jurisdictional requirement and, as such, may be raised at anytime by either party or *sua sponte* by this Court. *See Ex Parte Sadisco of Greenville, Inc. v. Greenville County Bd. of Zoning Appeals,* 340 S.C. 57, 530 S.E.2d 383 (2000); *Bardoon Props., NV v. Eidolon Corp.,* 326 S.C. 166, 485 S.E.2d 371 (1997); *Badeaux v. Davis,* 337 S.C. 195, 522 S.E.2d 835 (Ct.App.1999). Therefore, we will review the Board's argument.

*Parks and Recreation Comm'n v. Somers,* 319 S.C. 65, 459 S.E.2d 841 (1995). As with statutes, the lawmakers' intent embodied in an ordinance "must prevail if it can be reasonably discovered in the language used." *Somers,* 319 S.C. at 67, 459 S.E.2d at 843. In this case, § 9:7 of the applicable zoning ordinance plainly states that appeals from the zoning board are controlled by "Title 6, Chapter 29." Accordingly, § 9:7 adopted the new statutory scheme, which included § 6–29–820, for all appeals from the Board's decisions.

The Board concedes that § 9:7 was a part of the applicable zoning ordinance at the time of Vulcan's appeal, but maintains that the mere reference to Title 6, Chapter 29 was insufficient to implement § 6–29–820 because "all of the elements necessary to implement" the new scheme were not adopted by the Greenville County Council until April, 1999. We disagree. The Board cites no authority for its position other than Greenville County Ordinance # 3229 which states in pertinent part that council "hereby adopts the Zoning Ordinance for Greenville County, as set forth in Exhibit 'A' ... *under the authority of* the South Carolina Local Government Comprehensive Planning Enabling Act of 1994 ... and *in accordance with* Section 6–29–710, *et seq.,* of the Code of Laws of South Carolina...." Greenville County, S.C., Ordinance 3229 (April 20, 1999) (emphasis added). Clearly, Ordinance 3229 did not implement the new statutory scheme; it merely adopted a zoning ordinance *in accordance with* the new scheme.[8] In fact, ordinance 3229's reference to the authority of the new statutory scheme prior to the scheme's mandatory adoption on December 31, 1999, implicitly demonstrates that Greenville County adopted the new scheme sometime prior to 3229's enactment in April, 1999.

■ Although the record does not reveal the exact date on which Greenville enacted § 9:7, it does reveal that it was enacted prior to Vulcan's appeal. The Legislature enacted § 6–29–820 during the 1994 session and gave local zoning authorities the option of implementing the new statute any-

---

8. Exhibit A is not a part of the record so we may not take judicial notice of it. *Bales v. Aughtry,* 302 S.C. 262, 395 S.E.2d 177 (1990). Nevertheless, as it was enacted after Vulcan's appeal, it is irrelevant to our review.

time prior to December 31, 1999. Act No. 355. Section 9:7 appears in the 1990 edition of Greenville's zoning ordinance which contained "revisions and amendments through September, 1996." Obviously, Greenville County exercised its option sometime prior to September of 1996 when it added § 9:7 to its zoning ordinance.[9] Accordingly, Vulcan's 1997 appeal was controlled by § 6–29–820.

The Board mailed a notice of its decision to Vulcan on August 19, 1997. Vulcan filed an appeal of that decision with the circuit court on September 17, 1997. As mentioned earlier, § 6–29–820 requires an appeal to be filed within thirty days after the board's decision is mailed. *See also* Rule 74, SCRCP ("Notice of appeal to the circuit court must be served on all parties within thirty (30) days after receipt of written notice of the ... decision appealed from."). Accordingly, Vulcan's appeal was timely.

## *The Board's Final Order*

The Board argues the circuit court erred by "interpret[ing] what it believed to be the Board's findings of fact" in the transcript of the August hearing. We disagree.

■ Contrary to the Board's assertion, the circuit court did not independently determine what findings of fact the Board reached during the August hearing. The court merely reviewed the findings of fact which had been specifically called for by the Board's chairman and duly entered in the record by various board members during the August hearing. Even if the trial court had relied on facts gleaned from the record, but which were not a part of the Board's findings, there is no error. A reviewing court in a zoning case may rely on uncontroverted facts which appear in the record, but not in a zoning board's findings. *Stanton v. Town of Pawleys Island,* 317 S.C. 498, 455 S.E.2d 171 (1995). As there were no

---

9. The Board's reliance on its operating bylaws as proof of the controlling statute is misplaced. The Board is a creature of the zoning ordinance and as such is controlled by that ordinance. *See* Ordinance § 9:1 (creating the Board); § 9:3 ("The Board ... shall draw up and adopt bylaws governing the conduct of its affairs *which are in keeping with the provisions of this Ordinance* .") (emphasis added). Accordingly, those portions of the bylaws which contradict the ordinance are ineffective.

contested issues of fact in the present case, the lower court could not have erred by relying on any facts found in the record. The real issue before this Court is whether the trial court erred in utilizing the August transcript as the Board's final decision.

In utilizing the August transcript as the Board's final decision, the circuit court rejected the Board's proffer of the October 23rd document as its final decision because: (1) there was no evidence that the "four members of the Board who voted against Vulcan considered or assented to the October document," (2) the "October Document ... [was] materially different from the decision set forth in the August transcript," and (3) "the August transcript sets forth the decision of the Board in its entirety, and this was confirmed in writing on August 18, 1997." [10] We agree.

## 1. Board Action is Required

■ The October 23rd order is, at best, a nullity because the chairman and secretary had no authority to promulgate an order on behalf of the Board.

> Generally, an administrative agency, board, or commission should act as a body, and, in the absence of a statutory exception, can act officially only in or at a lawfully convened session, if the act is one requiring deliberation or the exercise of discretion or judgment. Except where authorized by statute, the powers and duties of an administrative body may not be exercised by the individual members separately.

73 C.J.S. *Public Administrative Law and Practice* § 16 at 384–385 (1983); *see also* 73A C.J.S. *Public. Administrative Law and Practice* § 138 at 83 (1983) ("Where the legislature gives quasi-judicial powers to an administrative agency or officer, only the agency or person granted the authority may exercise it, and it has been held that a hearing and decision by a person not authorized, notwithstanding approval by an administrative agency or officer, is without legal force and effect."); 101A C.J.S. *Zoning & Land Planning* § 189 at 560 (1979) ("In order to be the action of the board, the action must be that of the board as such and not merely the action of the

---

10. The lower court also stated that it would have reached the same decision even if the October document was the Board's final decision.

individual members thereof or even of a majority of the members."); *cf.* 56 Am.Jur.2d § 155 *Municipal Corporations* § 155 (1971) ("[T]he powers of a municipal council or body must be exercised at a meeting which is legally called. Action of all the members of the council separately is not the action of the council, and an agreement entered into separately by the members of the council outside a regular meeting is not binding.").

▮ The Board's reliance on its bylaws as authority for the chairman and secretary to issue an order on behalf of the Board is misplaced. In pertinent part, the bylaws require that "[t]he final decision of the Board shall be shown in the record of the case as entered in the minutes of the Board and signed by the Chairman and the Secretary *upon approval of the minutes by the Board.*" By–Laws § V(B) (1996) (emphasis added). This procedure describes how the Board's decision is to be memorialized in the minutes of the Board's proceedings; it does not grant the chairman and secretary the authority to promulgate an order without the Board's approval. In fact, the signatures of the chairman and secretary are merely ministerial acts because the entry of a decision into the minutes requires Board approval.

In any event, even if the bylaws did bestow such authority upon the chairman and secretary, the grant would be ineffective as both the common law and the Greenville County Zoning Ordinance require a quorum of the board members to be present before the Board may undertake a final action. Ordinance § 9:3.3; *see also* S.C.Code Ann. § 4–27–260 (Supp. 1999) ("A majority of the board of adjustment shall constitute a quorum...."); *Gaskin v. Jones,* 198 S.C. 508, 513, 18 S.E.2d 454, 456 (1942) ("[N]o valid act can be done in the absence of a quorum. A majority of such a body must be present to constitute a Board competent to transact business."); By–Laws § III(D) (defining a quorum as five members). The October document was only executed by one board member, the chairman.[11] Accordingly, the October document cannot constitute the final action of the Board.

---

11. The secretary is appointed by the Board, but is not a board member. By–Laws § II(C).

## 2. Material Differences Between the Decision and the October Document

The findings of fact and conclusions of law contained in the October document are materially different from those reached by the Board during the August hearing. For example, the October document correctly quotes S.C.Code Ann. § 48–20–40(1) (Supp.1999) which, in pertinent part, states the "[r]emoval of overburden ... [is] not considered mining when done only for the purpose of determining location, quantity, or quality of a natural deposit ... *and if the affected land does not exceed two acres in area.*" (emphasis added). However, when board member Kopp offered the same statute during the Board's deliberations in August, he failed to mention the two acre qualification, thereby allowing him to incorrectly assert that Vulcan's removal of overburden from fifteen acres was not considered mining pursuant to § 48–20–40(1).

## 3. The August Transcript Sets Forth the Board's Final Decision

■ Both the old and new statutory schemes require a zoning board's decision to be in writing and contain separate findings of fact and conclusions of law. *Compare* S.C.Code Ann. § 6–7–740 (1977), *with* S.C.Code Ann. § 6–29–800 (Supp. 1999). Neither statutory scheme specifies the form the writing must take; however, the South Carolina Administrative Procedures Act recognizes both written documents and records of proceedings as appropriate formats for final decisions in contested cases. S.C.Code Ann. § 1–23–350 (Supp.1999). Generally, the format of a final decision is immaterial as long as the substance of the decision is sufficiently detailed so as to allow a reviewing court to determine if the decision is supported by the facts of the case. *Able Communications, Inc. v. South Carolina Pub. Serv. Comm'n,* 290 S.C. 409, 351 S.E.2d 151 (1986); *Cloyd v. Mabry,* 295 S.C. 86, 367 S.E.2d 171 (Ct.App.1988); *cf. Ross v. Medical Univ. of South Carolina,* 328 S.C. 51, 65, 492 S.E.2d 62, 70 n. 6 (1997) (allowing a committee's report to fulfill the "findings of fact and conclusions of law" requirement of § 1–23–350 where the letter announcing the committee's decision did not meet the requirement).

■ In this case, the circuit court "consider[ed] the August transcript, as confirmed by the letter dated August 18, 1997, to be the decision of the Board." Because the August transcript was a writing and contained findings of fact and conclusions of law separately stated, we find the trial court did not err in viewing the August transcript as the Board's final decision.

### Definition of Mining .

■ The Board argues the removal of the overburden was not mining as it was accomplished without a mine operating permit. We disagree.

Overburden is "the earth, rock, and other materials that lie above the natural deposit of minerals." S.C.Code Ann. § 48–20–40(9) (Supp.1999). The "removal of overburden lying above natural deposits of ore or mineral solids ..." is a type of mining. S.C.Code Ann. § 48–20–40(1)(b) (Supp.1999). Most types of mining require a mine operating permit from DHEC. S.C.Code Ann. § 48–20–60 (Supp.1999). However, under certain circumstances, mining may occur without a mine operating permit. The relevant exception to the mining permit requirement in the action *sub judice* is the "borrow pit" exception. The operator of a borrow pit may mine soil and other materials for use in the construction, repair or maintenance of a public road if the mine operator has a contractual obligation to perform such road work for the South Carolina Department of Transportation (DOT). S.C.Code Ann. § 48–20–280 (Supp.1999).

■ In this case, Thrift Brothers removed ten to fifteen acres of overburden on Vulcan's behalf to expose the granite deposit for Vulcan and provide Thrift Brothers with soil and other material for a DOT highway project. Although the Thrift Brothers' operation clearly met the definition of mining set forth in § 48–20–40(1)(b), a mine operating permit was not required because the extracted overburden was used on a DOT project. The mere absence of a mining permit does not mean mining did not occur. DHEC's manager of mine permitting, Craig Kennedy, provided this insight to the Board in a letter dated August 1, 1997, in which he opined that "not all types of mines ... require a mine operating permit." Kenne-

dy enumerated two instances where mining can occur without a mine operating permit, one of which involved the exact situation at issue here, the removal of overburden for a highway project pursuant to § 48–20–280.[12] The construction of a statute by the agency charged with its administration should be accorded great deference and will not be overruled without a compelling reason. *Glover by Cauthen v. Suitt Const. Co.*, 318 S.C. 465, 458 S.E.2d 535 (1995); *see also* 101A C.J.S. *Zoning & Land Planning* § 161 at n. 99 (1979) ("It has been held ... that with respect to gravel and stone production, ... [the] ordinary concept of use must yield to realties of that business."). The instant action presents no compelling reason to ignore the plain meaning of the statutory exemption and the common sense interpretation given it by DHEC. Accordingly, we find as a matter of law that Vulcan mined the Princeton site.

### *Nonconforming Use/Vested Right*[13]

The Board argues the trial court erred in finding that Vulcan had a vested right to mine the Princeton site as a nonconforming use because Vulcan merely contemplated mining the site and a contemplated use of property is not sufficient to establish a nonconforming use. We disagree.

The Board maintains the removal of timber and overburden from atop the granite deposit was merely a preparation to mine rather than actual mining. Relying on our decision in *F.B.R. Investors v. County of Charleston* for the proposition that "a contemplated use of property by a landowner on the date a zoning ordinance becomes effective precluding such use is not protected as a nonconforming use," the Board contends

---

**12.** The Board's reliance on Kennedy's letter is unfounded. For example, the Board points to an incident described in the letter where the City of Columbia closed a borrow pit operation after discovering it was located in a zoned area which did not allow mining. Rather than bolstering the Board's claim that a borrow pit is not a mine, this anecdote demonstrates the exact opposite.

**13.** Essentially, "nonconforming use" and "vested right" refer to the same concept—a use of property which existed lawfully before the enactment of a zoning ordinance may continue afterwards even though the use does not comply with the zoning restriction. *See* 83 Am.Jur.2d *Zoning and Planning* § 624 (1992).

that Vulcan's preparations to mine the site were not entitled to nonconforming use status. *F.B.R. Investors v. County of Charleston*, 303 S.C. 524, 527, 402 S.E.2d 189, 191 (Ct.App. 1991).

In *F.B.R.*, a group of investors purchased a fifteen acre tract of land to build multi-family dwellings. Instead of developing the entire tract as a single project, the investors decided to develop the tract in two phases. Their plan called for the construction of 25 duplexes on an eight acre parcel of the tract during Phase I of the project, which would then be followed by the building of additional multi-family dwellings on the remaining parcel as Phase II of the development. As Phase I neared completion, but before any "substantial" expenses had been incurred toward Phase II, the second parcel was rezoned to prohibit multi-family dwellings. The investors claimed they had a "vested right" to complete Phase II due to their expenditures on Phase I. The trial court agreed because it viewed the development as an aggregate rather than two separate projects. This Court reversed the trial court because the investors chose to develop the tract as two separate projects. The investors' focus on Phase I left Phase II "essentially barren land when the zoning change occurred"; therefore, we held the investors had not expended the necessary effort to establish a vested right to complete Phase II. *Id.*

The Board also relies on our supreme court's decision in *City Ice Delivery Co. v. Zoning Board of Adjustment of Charleston*, 262 S.C. 161, 203 S.E.2d 381 (1974). In *City Ice*, a company planned to establish a commercial nonconforming use for an undeveloped piece of property before a pending zoning ordinance limited the property to single-family residential use. The company established its nonconforming use by purchasing the property and obtaining a building permit to construct a food store shortly before the prohibitive zoning was enacted. However, after the zoning was in place, the company sought permission to add gasoline pumps to the food store. The court found that the company failed to establish a vested right to install the pumps because it had not expended any funds on the pumps' installation prior to the enactment of the prohibitive zoning. Therefore, the court held the installation of the pumps would be an improper expansion of the nonconforming use.

Lastly, the Board points to *Whitfield v. Seabrook,* 259 S.C. 66, 190 S.E.2d 743 (1972). In *Whitfield,* a developer planned to establish a nonconforming use for an apartment building on unzoned property shortly before the property was zoned for single-family dwellings. Although the county issued the developer a building permit for the apartment building, a building inspector warned the developer that he must start construction before the prohibitive zoning was enacted in order to establish a nonconforming use. Despite the warning, the developer failed to begin constructing the nonconforming building prior to the zoning. Consequently, the court found the developer had no vested right to a nonconforming use of the property.

The case at bar is factually distinguishable from the aforementioned cases because a nonconforming use was not commenced in any of these cases prior to the enactment of prohibitive zoning, whereas Vulcan commenced a nonconforming use at the Princeton site well before it was zoned. "A landowner acquires a vested right to continue a nonconforming use already in existence at the time his property is zoned in the absence of a showing that the continuance of the use would constitute a detriment to the public health, safety or welfare." *F.B.R.* at 527, 402 S.E.2d at 191. Vulcan expended nearly $2 million to find granite on the 585 acre Princeton site, arranged for the removal of fifteen acres of overburden to expose the granite for extraction, and was merely awaiting a mine operating permit from DHEC when the restrictive zoning stopped the development. "Acts of a landowner in development of his land, in order to require a finding that he has acquired a vested right to continue development as a nonconforming use, should *rise beyond mere contemplated use or preparation....* " 101A C.J.S. *Zoning & Land Planning* § 161 at 495 (1979) (emphasis added). Accordingly, Vulcan's pre-zoning development of the site established a nonconforming use. *See also* 101A C.J.S. *Zoning and Land Planning* § 64 at n. 80 (1979) ("Right to utilize one's property to conduct a lawful business becomes entitled to constitutional protection against otherwise valid legislative restrictions as to locality by city's zoning ordinance, or becomes 'vested' within the full meaning of that term, when, prior to enactment of such restrictions, owner has in good faith substantially entered on

performance of a series of acts necessary to accomplishment of end intended. . . .").

The Board also maintains the trial court erred in finding that Vulcan has a vested right to continue its nonconforming use at the site because a party may not acquire a vested right in unzoned property. We disagree.

 The Board cites no direct authority for the proposition that there is no right to continue the lawful use of unzoned property after the enactment of a prohibitive zoning ordinance and, indeed, none exists in South Carolina. To the contrary, "one's property may be continued to be used for the same purpose it was being used at the time of the passage of a [prohibitive] zoning ordinance." *James v. City of Greenville*, 227 S.C. 565, 578, 88 S.E.2d 661, 667 (1955). In *James*, the court upheld James' right to continue to operate a business (trailer park) he established on unzoned property, but which the city subsequently zoned for single family dwellings only. As the court noted, "the substantial value of property lies in its use. If the right of use [is] denied, the value of the property is annihilated, and ownership is rendered a barren right." *Id.* at 579, 88 S.E.2d at 668 (quoting *Gasque v. Town of Conway*, 194 S.C. 15, 21, 8 S.E.2d 871, 873 (1940), *overruled on other grounds, McCall v. Batson*, 285 S.C. 243, 329 S.E.2d 741 (1985)) (citations omitted). If we adopted the Board's view, unzoned property could be zoned on a whim and without any consideration to property owners' rights. *See Friarsgate, Inc. v. Town of Irmo*, 290 S.C. 266, 269, 349 S.E.2d 891, 893 (Ct.App.1986) ("Generally, in American jurisdictions a landowner who uses his property for a lawful purpose before the enactment of zoning which subsequently prohibits that use may continue the nonconforming use after the enactment of zoning unless the use clearly constitutes a public nuisance. Otherwise, the landowner would be deprived of a constitutionally protected right.").

The Board attempts to extrapolate the holding in *Sherman v. Reavis*, 273 S.C. 542, 257 S.E.2d 735 (1979) into support for its position. In *Sherman*, the court held a property owner was not entitled to a building permit to erect a billboard on unzoned property because the landowner knew the city was in the process of rezoning the property to prevent such a struc-

ture. This holding merely acknowledges a good faith require-ment in establishing a nonconforming use so that a landowner may not obtain nonconforming use status to defeat a pending zoning ordinance which would prohibit the use. *See* 83 Am. Jur.2d *Zoning and Planning* § 648 at 549 (1992) ("Good faith, as the term is used in the nonconforming-use cases, apparent-ly means without knowledge of the pendency of a restrictive [zoning] ordinance."). *Sherman* in no way supports the notion that the owner of unzoned property is not entitled to a nonconforming use under the circumstances of the instant action.

For the aforementioned reasons, the decision of the circuit court is

**AFFIRMED.**

HUFF and HOWARD, JJ., concur.