588 S.E.2d 606

**In the Matter of Marvin Daniel ISEMAN, Respondent.**

**No. 25744.**

Supreme Court of South Carolina.

Heard June 11, 2003.

Decided Nov. 3, 2003.

---

Barbara M. Seymour, of Columbia, for The Office of Disciplinary Counsel.

Marvin Daniel Iseman, of Eastover, pro se.

PER CURIAM:

Marvin Daniel Iseman ("Respondent") has taken exception to the Subpanel of the Commission on Lawyer Conduct's ("Subpanel") recommendation that he be disbarred and required to pay the costs of these proceedings.

### FACTUAL/PROCEDURAL BACKGROUND

This attorney discipline matter arises from Respondent's conduct involving two separate events: (1) a series of money leasing transactions and (2) bank fraud.

### A. "MONEY LEASING" TRANSACTION

Evidently deft at putting together convoluted international business transactions that circumvent tax laws and involve large amounts of risk, Respondent was hired by a Kentucky law firm in late 1996 to scrutinize the structure of a business deal originating in London. According to Respondent, the deal was a "money leasing" transaction that involved raising $3 to $5 million in cash to "lease" $40 million in cash from a Mexican bank, which would be exchanged for a "German Bank Guarantee" and not constitute a taxable event. Respondent came in contact with Volker Schneider ("Schneider"), who invested $480,000 into the deal in February 1997. According to Respondent, Schneider told him that coming up with the rest of the $3 to $5 million needed to "lease" the $40 million would not be a problem. But then in late May 1997, Schneid-

er informed Respondent that he could not raise the balance of the capital needed for the investment. Respondent alleges that he raised the rest of the seed money elsewhere.

The $480,000 that Schneider transferred to Respondent originally came from Mathias Heizmann ("Heizmann"), who had decided to invest a large portion of his family's savings with a Rudolf Wehrli ("Wehrli"). Heizmann discovered Wehrli in a local German newspaper advertisement, where he claimed to be a "professional financial advisor and broker." Wehrli gave the sum of money to Schneider for investment purposes only to discover later that the money had been "lost." Wehrli hired Hans Neuhauser, an attorney with an anti-fraud practice, to attempt to recover the large sum.

Respondent was in Zurich in September 1997, when he was approached by Neuhauser, who explained to Respondent about the origin of the $480,000. Neuhauser wanted the money returned to Heizmann. Respondent confirmed with Schneider the existence of a "Mr. Wehrli," returned to the United States, and decided to write Neuhauser a letter offering to return the $480,000 in exchange for a release and indemnity from Mr. Wehrli.[1]

On September 30, 1997, Respondent and Neuhauser executed a Comprehensive Release, which provided that in exchange for Respondent's payment of $500,000, Respondent would be released from any claim asserted by Wehrli. Respondent postdated the $500,000 check for October 3, 1997, so that he could give himself a little "contingent time." Respondent also told Neuhauser that if he did not want to proceed with the agreement, he would issue a Stop Payment Order on the check. Respondent further stated that he did not believe that Neuhauser was aware of how the stop payment process functioned in the United States. In his Answer to the Commission on Lawyer Conduct's Filing of Formal Charges, Respondent wrote, "in truth, I think I simply wanted to get rid of Neuhauser as diplomatically as possible knowing I could either go forward with the Release or NOT, based upon Schneider's or my own opinion." After discussing the matter with Schneider, who reiterated that he did not want to back

---

1. Wehrli assigned all of his claims against Respondent to Heizmann.

out of the deal, Respondent issued a Stop Payment Order for the check.

Unable to collect any of his $480,000, Heizmann hired a local attorney and filed a civil action in federal court here in South Carolina for breach of contract. In his Answer, Respondent generally denied all claims, and he did not reply to Heizmann's requests for admissions or motion for summary judgment. Consequently, Heizmann was awarded summary judgment against Respondent in the amount of $500,000 plus interest, and Respondent did not appeal the judgment.

■ The Subpanel found that Respondent's conduct in connection with his signing of the Comprehensive Release, coupled with his Stop Payment Order, constituted a violation of Rule 8.4(d) of the *Rules of Professional Conduct,* Rule 407, SCACR. We agree.

Rule 8.4(d) states that it is misconduct for a lawyer to engage in fraudulent, dishonest, and deceitful conduct. By his own admission, Respondent exhibited this type of misconduct because he never intended to perform his obligation under the Comprehensive Release, i.e., pay the $500,000.

Between September 22, 1997 (the date that Respondent faxed Neuhauser the letter requesting the indemnification) and September 30, 1997 (the date the Comprehensive Release was signed) Respondent spoke with Schneider, and Schneider stated that he would stay in the deal and "would *not* comply with [Respondent's] Sept. 22 letter to Neuhauser." [2] Knowing that the party who originally gave him $480,000 did not want him to remit the money to Wehrli, Respondent executed the agreement and post-dated the check to give himself some "contingent time." And believing that Neuhauser did not understand how the stop payment process functioned in the U.S., Respondent told Neuhauser that he could issue a Stop Payment Order if he wanted to get out of the deal.[3] Respondent then talked with Schneider and issued the Stop Payment Order.

---

**2.** Respondent sent a copy of the September 22 letter to Schneider.

**3.** No section of the Comprehensive Release indicated that the agreement was contingent on Respondent's decision to request a Stop Payment Order.

Respondent essentially admits that Schneider maintained his position—that he wanted the deal to go through and that he did not want Respondent to sign the Comprehensive Release—throughout the transaction. We find that Respondent had no intention other than to decieve Neuhauser into thinking that the money would be returned to his client. Respondent could not have revealed his intent more lucidly than when he wrote, "[I]n truth, I think I simply wanted to get rid of Neuhauser as diplomatically as possible." Thus, we hold that Respondent violated Rule 8.4(d).

## B. BANK FRAUD

Respondent was indicted by the Grand Jury of the U.S. District Court of South Carolina on March 22, 2000, for five counts of wire fraud in connection with the Schneider/Wehrli/Heizmann scheme and three counts of bank fraud arising from an unrelated check-kiting scheme that occurred between August 1998 and December 1999. The U.S. government extradited Respondent in April 2000 from a Swiss prison, where he had been incarcerated in connection with the Heizmann affair.

In August 2000, Respondent entered into a Plea Agreement and agreed to plead guilty to Count 8, which claimed that he engaged in a scheme to defraud and obtain money by false pretenses from Bank of America by presenting a check for deposit and cash drawn on another account at First Union, an account that he knew contained insufficient funds. The judge sentenced Respondent to twelve months in prison and ordered him to pay $116,220.38 in restitution.

According to Rule 16(d) of the *Rules of Lawyer Disciplinary Enforcement,* (RLDE), Rule 413 SCACR, "[a] certified copy of a judgment of conviction constitutes conclusive evidence that the lawyer committed the crime, and the sole issue in any disciplinary proceedings based on the conviction shall be the nature and extent of the discipline imposed." Respondent pled guilty to bank fraud, which is classified as a serious offense under Rule 2(z) of the RLDE. *In the Matter of Holt,* 328 S.C. 169, 492 S.E.2d 793 (1997). The Subpanel found that in committing bank fraud, Respondent violated Rules 8.4(b),

8.4(c), 8.4(d), and 8.4(e) of the *Rules of Professional Conduct*, Rule 407, SCACR.

## C. THE HEARING

▇ Respondent takes exception to the Subpanel's denial of his motion for a new hearing. After being released from prison in January 2000, Respondent resided at Caughman Farms in Eastover, South Carolina. His initial hearing in front of the Subpanel was scheduled for June 13, 2000. Respondent originally told Barbara Hinson ("Hinson"), Administrative Assistant for the Commission on Lawyer Conduct, that the scheduled date was "fine" with him. Three days prior to the hearing, Respondent called Hinson to inform her that his brother-in-law would be representing him at the hearing but that his brother-in-law would be out of the country on that date. Respondent requested a continuance, which was granted. On June 14, Hinson sent a certified notice to Respondent at his Eastover address, which stated that the hearing had been rescheduled for July 9. She received the return receipt of the certified mailing on June 19, which was signed, but not by Respondent. Respondent claims that he never received the notice of the rescheduled hearing, and Edward Caughman attested to the claim in a sworn affidavit.

Respondent did not appear at the July 9 hearing, as he was in New York between June 23 and July 20, and the hearing proceeded without him. Respondent made a motion for a new hearing, which the Subpanel denied.

We hold that the Subpanel did not err in denying Respondent's motion for a new hearing because service was proper under Rule 233(b) SCACR (setting forth the proper service requirements in attorney discipline matters), and the Commission received the return receipt on June 19, which was four days prior to Respondent's departure to New York on June 23. Further, we agree with the Subpanel that Respondent had every reason to believe that the hearing would be promptly rescheduled after the June 13 hearing was continued.

## D. SANCTION

▇ This Court holds the ultimate authority to sanction attorneys, and we are not bound by the Subpanel's findings.

*In the Matter of Yarborough,* 327 S.C. 161, 165, 488 S.E.2d 871, 873 (1997). Nevertheless, we agree with the Subpanel's recommendation that Respondent should be disbarred because of his bank fraud conviction and his involvement in the defrauding of Mr. Heizmann.

In *Holt,* we determined that bank fraud, by itself, constitutes sufficient grounds for disbarment. *See also, In the Matter of Welch,* 355 S.C. 93, 584 S.E.2d 369 (2003) (a guilty plea of bank fraud constituted the primary justification for disbarment); *In the Matter of Yarborough,* 343 S.C. 316, 540 S.E.2d 462 (2000) (involvement in a check-kiting scheme, committing bank fraud, and using escrow funds to pay a margin call warranted disbarment).

Although Respondent's conviction of bank fraud alone is sufficient grounds for disbarment, his violation of Rule 8.4(d) in connection with the Heizmann matter provides additional support for the sanction of disbarment. Finally, we note that Respondent's prior disciplinary history exhibits a tendency to engage in lawyer misconduct involving deceit. *See In the Matter of Iseman,* 287 S.C. 194, 336 S.E.2d 474 (1985) (Respondent was issued a public reprimand for failing to preserve the identity of funds and property of a client; thus violating DR 1–102(A)(4), which is the present-day Rule 8.4(d).); *In the Matter of Iseman,* 290 S.C. 391, 350 S.E.2d 922 (1986) (Respondent was suspended for 90 days because he misrepresented the amount of Continuing Legal Education credits he had earned.).

### CONCLUSION

Accordingly, we disbar Respondent. Within fifteen days of this opinion, Respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, of Rule 413, SCACR, and shall also surrender his Certificate of Admission to the Practice of Law to the Clerk of Court. We also require that Respondent pay the costs of these proceedings.

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.