644 S.E.2d 710

**Ned B. MAJORS and Tax Lien Agents, Inc., Appellants,**

**v.**

**SOUTH CAROLINA SECURITIES COMMISSION, Respondent.**

**No. 26317.**

Supreme Court of South Carolina.

Heard Nov. 14, 2006.

Decided April 23, 2007.

Rehearing Denied May 23, 2007.

154

156

John F. Beach and John J. Pringle, Jr., both of Ellis, Lawhorne & Sims, of Columbia, and Ned Majors, of Myrtle Beach, for Appellant.

Scott E. Hultstrand and Tracy A. Meyers, both of Office of the Attorney General, of Columbia, for Respondent.

Justice WALLER.

We certified this case from the Court of Appeals pursuant to Rule 204(b), SCACR. The South Carolina Securities Exchange Commission ordered Appellants, Ned Majors and Tax Lien Agents, Inc. (collectively TLA), to "Cease and Desist Selling Unregistered Securities and Engaging in Securities Fraud." TLA appeals, contending it is not engaged in the sale of "securities." We disagree and therefore affirm.

## FACTUAL BACKGROUND

Ned Majors is President and sole shareholder of TLA, a South Carolina Corporation operating in Myrtle Beach since 1998. TLA's business centers around the purchase of tax lien certificates (TLCs) at city and county tax lien auctions throughout the country. Pursuant to TLA's "Agency Contract," TLA is the purchasing agent for its Principals. TLA Agents make all purchasing decisions, and they bid competitively for purchases at auctions by offering to accept a lower interest rate than the statutory rate to which purchasers would otherwise be entitled. Pursuant to the contract, the Agent bids on tax liens which TLA believes have a reasonable prospect of not being redeemed. The Principal agrees to pay

Agent a "non-refundable agency fee" (between 12–25% of the principal's initial tax lien purchase amount) and grants TLA an inchoate interest of 50% ownership in any unredeemed TLCs.

For each TLC purchased on a principal's behalf, the principal gives the Agent a cashiers check (or a Trust directive if using a trust) made payable to the "County Treasurer for Tax Liens." The TLCs purchased are listed in the principal's name. If a TLC is redeemed before its maturity date (usually 1–3 years), the Principal keeps all redemption monies, including interest and penalties; however, if the TLC is not redeemed, the Principal agrees to immediately sign papers to assign, convey and register the property, and to confirm the Agent has a 50% ownership interest in the net profit of the TLC and any resultant deed issued. The Principal is required (unless agreed upon with the Agent) to commence good faith efforts to quiet the title and sell the property. Although Principals have the right to select closing attorneys and quiet title, etc., they very seldom do so as the majority are absentee owners living a considerable distance from the properties; the majority use TLA's services to facilitate both the sale and quieting title. Although TLA represents only one principal for each TLC purchased, an agent represents 15–20 principals (also referred to as "employers") at each tax sale or as many as 200 "employers" over a two week period.

If a Principal wishes to sell TLCs, the Agent has first right of refusal, and if the TLC is sold to any other party, the third party must agree to the same contract terms as the Principal. If either party elects, the underlying property which was not redeemed may be purchased by paying 50% of the average of three appraisals. The agency contract also states that "while there are no risks in owning government sold and issued TLCs that are redeemed (paid off), there are potential down side financial risks if a TLC matures into a property deed as the underlying property market value could substantially drop during the tax lien maturity period."

## PROCEDURAL BACKGROUND

In September 2003, the Attorney General, acting as the South Carolina Securities Exchange Commissioner (Commis-

sioner), entered an order for Majors and TLA to "Cease and Desist Selling Unregistered Securities and Engaging in Securities Fraud" and gave them notice of a right to a hearing. The Commissioner appointed G. Marcus Knight as the Administrative Hearing Officer for the matter, and a public hearing was held on Oct 30–31, 2003. Thereafter, Knight issued a detailed report and recommendation concluding that 1) the South Carolina Uniform Securities Act (the Act) applied because TLA was engaged in the sale of "securities" as defined in that Act, S.C.Code Ann. § 35–1–20(15) because its contract constituted an "investment contract." The Hearing Officer also rejected TLA and Majors' contention that the manner of issuance of the cease and desist order deprived them of due process, or that their due process rights were violated by his appointment as Hearing Officer. The Hearing Officer concluded that the Commissioner should order a final Cease and Desist Order, pursuant to S.C.Code Ann. § 35–1–60, due to a violation of the registration requirements § 35–1–810 of the Act. However, the Commissioner opined the Final Order should exclude any reference to TLA making "material misrepresentations and/or omissions" in connection with its sale of TLCs, and should not pursue any criminal or civil penalties.

In February 2004, the Commissioner issued a "Final Order to Cease and Desist Selling Unregistered Securities." The Commissioner found TLA's investment opportunity constituted a "security" under the Act and also found a violation of the registration requirements § 35–1–810. TLA and Majors were ordered to cease and desist from offering or selling the TLC investment opportunity in or from the State of South Carolina. The final order did not find TLA was engaged in securities fraud.

Majors and TLA appealed to the circuit court which ruled 1) the investment opportunity offered was a security, 2) the SEC Commission had authority to issue the original cease and desist order, and 3) Majors and TLA were afforded due process in the underlying administrative proceeding.

## ISSUES

1. What is the proper standard of review?

2. Did the SEC have authority to issue the initial cease and desist order?

3. Were Appellants afforded due process in the underlying administrative proceeding?

4. Were Appellants properly ordered to cease and desist from the sale of unregistered securities in violation of the S.C. Uniform Securities Act?

## 1. STANDARD OF REVIEW

■ The issue in this case involves a decision of whether TLA's sale of TLCs constitutes the sale of securities. We find this is a novel question of law, such that we are free to decide the issue with no particular deference to the lower court. *Baggerly v. CSX Transp. Inc.,* 370 S.C. 362, 635 S.E.2d 97 (2006), *citing I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 411, 526 S.E.2d 716, 719 (2000).

## 2. INITIAL CEASE AND DESIST ORDER

■ TLA asserts the Commissioner had no statutory authority to enter the initial Cease and Desist order, such that the whole proceeding should be voided for lack of subject matter jurisdiction. We disagree.

■ This issue is not one of subject matter jurisdiction. Subject matter jurisdiction is the power to hear and determine cases of the general class to which the proceedings in question belong. *Dove v. Gold Kist, Inc.,* 314 S.C. 235, 236, 442 S.E.2d 598, 600 (1994); *State v. Gentry,* 363 S.C. 93, 610 S.E.2d 494 (2005).

In any event, S.C.Code Ann. § 35–1–60 (2004 Supp), as it read at the time this matter arose, stated in pertinent part, "The Securities Commissioner may make, amend, and rescind those rules, forms, and orders, **including cease and desist orders,** as are necessary to carry out the provisions of this chapter . . ." (emphasis supplied).

As originally written, S.C.Code Ann. § 35–1–60 did not allow the Commissioner to issue cease and desist orders. It was amended in 1992 to permit the Commissioner to "make, amend, and rescind those rules, forms, and orders, including cease and desist orders . . ." 1992 Act No. 451 § 1, eff. June

15, 1992. We find it was within the Commissioner's authority to issue the initial cease and desist order.[1]

## 3. DUE PROCESS

■ TLA and Majors next assert issuance of the cease and desist order in violated their rights to due process. We disagree.

■ The initial cease and desist order, prior to a hearing, was permissible. *See Ross v. MUSC*, 328 S.C. 51, 72, 492 S.E.2d 62, 69 (1997) (Article I, § 22, requires an administrative agency provide notice and an opportunity to be heard, but does not require notice and an opportunity to be heard at each level of the administrative process. It mandates notice and opportunity to be heard at some point before the agency makes its final decision).

Moreover, contrary to TLA's contention, we find no due process violation in the SEC Commissioner's role in this matter.

■ In *Ross v. MUSC*, 328 S.C. 51, 492 S.E.2d 62 (1997), we held the purpose of S.C. Const., Art. I, § 22 is to ensure adjudications are conducted by impartial administrative bod-

---

1. We note also that, effective Jan. 1, 2006, Chapter 1 of the South Carolina Uniform Securities Act was repealed and replaced with a new Chapter 1, to comport with the Uniform Securities Act promulgated by the National Conference of Commissioners on Uniform State Laws. Section 35–1–60 has been repealed. In its place, §§ 35–1–603 and 35–1–604 now govern civil and administrative enforcement of the Act. Section 35–1–603 permits the Commissioner to maintain a civil action in the court of common please. Section 35–1–604 (Supp 2005) states, in pertinent part, as follows:

 a) If the Securities Commissioner determines that a person has engaged, is engaging, or is about to engage in an act, practice, or course of business constituting a violation of this chapter or a rule adopted or order issued under this chapter or that a person has materially aided, is materially aiding, or is about to materially aid an act, practice, or course of business constituting a violation of this chapter or a rule adopted or order issued under this chapter, the Securities Commissioner may: (1) issue an order directing the person to cease and desist from engaging in the act, practice, or course of business or to take other action necessary or appropriate to comply with this chapter . . .

 Clearly, the Commissioner has authority to issue cease and desist orders prior to commencement of a civil proceeding.

ies. Partiality exists where an adjudicator either has ex parte information as a result of prior investigation or has developed, by prior involvement with the case, a "will to win." *Ross*, 328 S.C. at 69, 492 S.E.2d at 72. In *Ross*, we found no violation of Section 22 where MUSC's president investigated a tenured professor's conduct, terminated the professor, and then testified against him at a committee hearing. We found no due process violation because the president did not later participate as an adjudicator, and he did not improperly consider ex parte information. *Id.* at 70, 492 S.E.2d at 72.[2]

In *Garris v. Governing Board of S.C. Reinsurance Facility*, 333 S.C. 432, 511 S.E.2d 48 (1998), this Court recognized, "the fact that investigative, prosecutorial, and adjudicative functions are performed within the same agency, or even performed by the same persons within an agency, does not, without more, constitute a violation of due process." 333 S.C. at 443, 511 S.E.2d at 54. In that case, Garris was a designated insurance agent for the South Carolina Reinsurance Facility. The Facility began investigating Garris, alleging irregularities in his underwriting practices. After a hearing, the Governing Board of the Facility voted to revoke Garris' status as a designated agent. Garris appealed, contesting the composition of the Board which revoked his designation. In *Garris*, the five Governing board members and one non-member of the South Carolina Reinsurance Facility attended one or more committee meetings at which Garris' case was discussed extensively in open and executive sessions, and all six voted to revoke Garris' status as a designated agent. Of those six, four were members of the committees which considered the Garris matter. Further, two other Governing Board members attended committee meetings and the hearing, but did not vote. We concluded the procedure violated due process, stating:

> we conclude that Governing Board members who participate in the investigation or prosecution of a designated agent as a member or observer at a committee meeting may not participate as adjudicators of that agent's case at a subse-

2. However, we did find a violation of Section 22 where the university vice-president investigated the professor's case, testified as an adverse witness at a committee hearing, and sat as the intermediate judge in a three-step disciplinary procedure. *Id.*

quent hearing. Members who participate in the investigation or prosecution of a case must distance themselves from the adjudicatory process, and should refrain from even discussing that case with future adjudicators.

333 S.C. at 446, 511 S.E.2d at 55.

*Garris* and *Ross* are distinguishable from the present case. Unlike those cases, the Commissioner did, in this instance, appoint a Hearing Officer to take evidence and make a report and recommendation. Further, the Commissioner did not personally participate in the gathering of the evidence before the Hearing Officer, and there is no evidence he discussed the underlying case with the Hearing Officer.

Moreover, we find the power of the SEC Commissioner is akin to this Court's power to issue an order of interim suspension of an attorney, and then, after an investigation by the Commission on Lawyer Conduct and a Report and Recommendation, issue the ultimate sanction. *See Kirven v. Board of Grievances and Discipline,* 271 S.C. 194, 246 S.E.2d 857 (1978) (members of Board of Grievance are officers of this Court commissioned and charged by this Court with the duty of investigating alleged acts of professional misconduct on the part of their fellow members of the bar, and of reporting to this Court the proceedings of their inquiry, their findings and recommendations); *Matter of Iseman,* 356 S.C. 280, 588 S.E.2d 606 (2003) (Supreme Court holds ultimate authority to sanction attorneys).

We find TLA and Majors have been afforded due process in this matter. The initial cease and desist order provided them with the right to a hearing, which they requested and were afforded by an independent Hearing Officer. Thereafter, they were permitted to appeal the SEC Commissioner's Final Cease and Desist Order, and were allowed to post a bond to stay enforcement of that order pending appeal. The order has further been stayed by this appeal.

## 4. SECURITY

■ Finally, TLA asserts that its sale of TLCs does not involve the sale of a security, and it is therefore not in violation of the Act, because it was not required to register under S.C.Code Ann. § 35–1–810 (1987) (making it unlawful to

sell any security in this state unless it is either registered or exempt). We disagree. The Commissioner and the circuit court properly held the sale of TLCs in this case constituted the sale of "securities" within the meaning of the Act.

S.C.Code Ann. § 35–1–20(12), as it read at time of the cease and desist order, defined a "security" as, inter alia, "any certificate of interest or participation in any ... investment contract ... or, in general, any interest or instrument commonly known as a security ..."

As noted by the Court of Appeals in *Garrett v. Snedigar,* 293 S.C. 176, 180, 359 S.E.2d 283, 285 (Ct.App.1987), *overruled on other grounds, Olson v. Faculty House of Carolina, Inc.,* 354 S.C. 161, 580 S.E.2d 440 (2003), "in construing the state Act, [the Court] may look for guidance to cases construing its federal counterpart." In *Garrett,* the Court of Appeals recognized that both our Act and the Federal Act define the word "security" to include any "certificate of interest or participation in any profit-sharing agreement, [or] investment contract." The Court of Appeals cited the seminal United States Supreme Court case of *Securities and Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, *reh'g denied,* 329 U.S. 819, 67 S.Ct. 27, 91 L.Ed. 697 (1946) in which the Court defined an investment contract as a "transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298–299, 66 S.Ct. 1100.

Under the *Howey* test, an investment contract exists where there has been (i) an investment of money, (ii) in a common enterprise, (iii) with an expectation of profits garnered solely from the efforts of others. *See Teague v. Bakker,* 35 F.3d 978, 986 (4th Cir.1994). The test is a flexible one, "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey,* 328 U.S. at 299, 66 S.Ct. 1100.

We find the Commissioner and the circuit court properly found TLA's sale of TLCs constitutes the sale of an "investment contract," such that under § 35–1–20(12), it constitutes a security and therefore TLA and Majors were properly or-

dered to cease and desist from the sale absent proper registration with the SEC Commission.

### a. Investment of Money

■ An "investment of money" under *Howey* means the investor must have committed his assets to the enterprise in such a manner as to subject himself to financial loss. *SEC v. Pinckney*, 923 F.Supp. 76, 80 (E.D.N.C.1996).

It is indisputable that Principals meet this test. They paid an up-front, non-refundable agency fee of 12–25 % of their TLC purchase price, they paid all fees and expenses associat-. ed with the purchase of the TLCs, as well as the expenses associated with establishing clear title to those properties which were not redeemed, and agreed to pay TLA 50% of the profits from the sale of any properties which were not redeemed. It cannot seriously be argued that Principals here did not make an investment of money.

TLA also asserts Principals were not subject to financial loss. However, its contract specifically states that, "while there are no risks in owning government sold and issued TLCs that are redeemed (paid off), there are potential down side financial risks if a TLC matures into a property deed as the underlying property market value could substantially drop during the tax lien maturity period." Accordingly, we find the first prong of *Howey* is met inasmuch as there is an "investment of money."

### b. Common Enterprise Test

■ TLA next contends the Commissioner, and the circuit court, erred in applying a "strict vertical commonality" test to determine whether it is engaged in a common enterprise. We disagree.

■ In order to meet the "common enterprise" prong of the *Howey* test, courts around the country have struggled with discerning whether vertical or horizontal commonality, or both, must exist. *See Top of Iowa Cooperative v. Schewe*, 6 F.Supp.2d 843, 852 (N.D.Iowa 1998) (noting that the Eighth Circuit had not ruled on whether either vertical or horizontal commonality or both are required under the "common enterprise" prong of *Howey,* such that the court examined the

contracts for either kind of commonality); *see also S.E.C. v. SG Ltd.*, 265 F.3d 42, 49 (1st Cir.2001) (citing and discussing the different standards in courts across the country); *S.E.C. v. Pinckney*, 923 F.Supp. 76, 81 (E.D.N.C.1996) (same). As a general guide, vertical commonality requires only a pooling of the interests of the developer or promoter and each individual investor, while "horizontal commonality" requires as well a pooling of interests among the investors. *Schewe*, 6 F.Supp.2d at 852 (citing *Wals v. Fox Hills Development Corp.*, 24 F.3d 1016, 1017–18 (7th Cir.1994)). *See also SEC v. Alpha Telcom, Inc.*, 187 F.Supp.2d 1250 (D.Or.2002) (holding the second element of the *Howey* test can be satisfied by the existence of either vertical commonality or horizontal commonality. Vertical commonality is the dependence of the investors' fortunes on the success or expertise of the promoter. Horizontal commonality is the pooling of investor funds and interests. *Citing Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 460 (9th Cir.1978).)

The courts have further identified two kinds of vertical commonality: broad vertical commonality and strict vertical commonality. To establish "broad vertical commonality," the fortunes of the investors need be linked only to the efforts of the promoter. *See Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 140–41 (5th Cir.1989). "Strict vertical commonality" requires the fortunes of investors be tied to the fortunes of the promoter. *Brodt v. Bache & Co.*

TLA asserts the only proper test is horizontal commonality which, by its nature, requires a pooling of interest among investors. We disagree.

Initially, we note that many courts have applied an "either/or" test of vertical and horizontal commonality such that there is a common enterprise if either test is met. *See e.g. Integrated Research Svcs. v. Illinois Sec. of State*, 328 Ill. App.3d 67, 262 Ill.Dec. 304, 765 N.E.2d 130 (2002); *SEC v. Parkersburg Wireless LLC*, 991 F.Supp. 6 (D.D.C.1997); *Securities and Exchange Commission v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125 (9th Cir.1991).

We find the newly revised Uniform Securities Act lend guidance to resolution of this issue. The comments to S.C.Code Ann. § 35–1–102(29)(D) state, in pertinent part:

The courts have divided over the interpretation of the "common enterprise" element of an investment contract. The courts generally recognize that "horizontal" commonality (for example, the pooling of an investment by two or more investors) is a common enterprise. A small minority of the federal circuits will also find a common enterprise in a "vertical" relationship when a single investor is dependent upon the expertise of a single commodities broker. Since two or more persons do not share in the profitability of an undertaking, it is difficult to argue that there is a common enterprise. Section 102(29)(D) follows a significantly larger number of federal circuits and adopts a more restrictive form of vertical commonality that occurs only when there is profit sharing between two persons even if, for example, one is a conventional investor and one is a promoter. *See generally* 2 Louis Loss & Joel Seligman, *Securities Regulation* 989–997 (3d ed. Rev.1999). In interpreting all elements of the investment contract, the courts have emphasized substance, not form.

Clearly, it appears the Legislature intends a strict vertical commonality test to apply. Accordingly, we find the trial court and Commissioner applied the proper test.

 TLA and Majors also assert that, even under a strict vertical commonality test, the Commissioner erred in finding a common enterprise because the relationship here is precisely the opposite of that found in cases of strict vertical commonality. It contends for such a relationship to exist, there must be a showing that the investors' profits are dependent upon the promoter's profits whereas, here, TLA's profits are dependent upon the profits of the principals. We disagree.

The court in *SEC v. TLC Investments*, 179 F.Supp.2d 1149, 1156 (D.Ca.2001), specifically rejected such a claim, holding that "TLC's fortunes were inextricably linked to the fortunes of the individual investors. So long as the promoter's gain is contingent on the investor's gain, there is a common enterprise."

### c. Efforts of others

Lastly, TLA asserts that because its Principals have input into purchasing and sales decisions, they do not have "an

expectation of profits garnered solely from the efforts of others." We disagree.

As noted by the Court of Appeals in *Garrett,* the third prong of *Howey* has been relaxed. In *Garrett,* the Court of Appeals held:

> Later cases have eliminated the requirement that one must expect profits solely from the efforts of others in order for an interest to be a security. *See United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621, *reh'g denied,* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 115 (1975) (the touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others); *O'Quinn v. Beach Associates,* 272 S.C. 95, 105, 249 S.E.2d 734, 739 (1978) (investment contracts may be found where the investor has duties that are nominal and insignificant or where the investor lacks any real control over the operation of the enterprise).

The key determination is whether the promoters' efforts, not that of the investors, form the "essential managerial efforts which affect the failure or success of the enterprise." *Unique Financial Concepts,* 196 F.3d at 1201 (*citing SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.1973)). *See also SEC v. Rubera,* 350 F.3d 1084 (9th Cir.2003) (test is whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise).

We find the test is met here. As noted in the Commission's order, although TLA's Principals retained some contractual rights of control, in practice their control was very limited. TLA made all of the purchasing decisions, and exercised the majority of control in issues relative to clearing title, picking closing attorneys, etc., because the majority of its investors lived a considerable distance away. As further noted in the Commissioner's order, TLA's marketing material indicated "we do all the work."

## CONCLUSION

In summary, we hold the SEC Commissioner has authority to issue initial cease and desist orders prior to a hearing, so

long as a hearing is thereafter afforded. Further, we find the procedure utilized here did not violate TLA's due process rights, and that the final cease and desist order was properly issued because TLA's sale of tax lien certificates was properly found to be the sale of "securities" within the meaning of the S.C. Uniform Securities Act. Accordingly, the order on appeal is

**AFFIRMED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.